**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **JON K. HEYER,**<br><br>                    **PLAINTIFF,**<br><br><br>                    **v.**<br><br>**BANK OF AMERICA, N.A., a Delaware Corporation, BAC Home Loans Servicing, L.P., a subsidiary of BANK OF AMERICA, N.A., a Delaware Corporation**<br><br><br><br>                    **DEFENDANTS.** | **Case No.:**<br><br><br>**Honorable _____Presiding**<br><br><br><br><br><br><u>**Jury Demand**</u> |

**<u>COMPLAINT</u>**

**<u>INTRODUCTION</u>**

Plaintiff Jon Heyer ("Plaintiff") by and through his attorneys, Law Office of Heather L. Blaise, P.C., brings this action to challenge Defendant Bank of America, N.A., acting independently and through its subsidiary BAC Home Loans Servicing, LP (referred to jointly as "BOA" or "Defendant" where not otherwise described in their individual capacities) for failure to honor the terms of their agreement with the United States Treasury for the intended benefit of homeowners, as well as their failure to honor their agreement directly with Plaintiff, a qualified borrower.

1.      Defendant has failed to honor its express and implied contractual obligations

under its Trial Period Plan Agreement ("TPP Agreement") with Plaintiff, has made repeated misrepresentations of material fact, and has engaged in business practices that are deceptive, immoral, unscrupulous, unfair, and oppressive under Illinois law. (*See* "TPP Agreement" attached as <u>Exhibit A</u>.)

2.      Under the Troubled Asset Relief Program ("TARP"), also known as the taxpayer bailout, the United States Government provided the nation's largest financial institutions with nearly $700 billion in funds to address what was widely accepted as an unprecedented financial crisis. 12 U.S.C. § 5211. In October 2008, Defendant Bank of America accepted $15 billion in TARP funds.  In January 2008, Defendant accepted another $10 billion in TARP funds in connection with its acquisition of Merrill Lynch, along with a partial guarantee against losses on $118 billion in mortgage-related assets. Bank of America thereby agreed to participate in one or more programs, needed to minimize foreclosures, which TARP authorized the Secretary of the Treasury to establish.

3.      A key feature of TARP, implemented by the Treasury Department, is the Making Home Affordable Program, of which the Home Affordable Modification Program ("HAMP" or "the HAMP") is a major component. HAMP is a program under which Defendant and other major banks receive incentive payments for providing mortgage loan modifications and other alternatives to foreclosure to eligible borrowers such as Plaintiff.  Companies that accepted funds pursuant to TARP are subject to mandatory inclusion in HAMP; the same is true for certain classes of loans, namely those held by Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac").

4.      Bank of America entered into a Servicer Participation Agreement ("SPA") with the U.S. Treasury on April 17, 2009 (attached as <u>Exhibit B</u>). The Servicer of a loan is the financial institution acting as agent for the owner of the loan, performing direct functions such as processing payments, loss mitigation, and overseeing foreclosure.  In Bank of America's capacity as a loan servicer, it agreed to comply with HAMP requirements, and to execute loan modification and other foreclosure prevention services, as described in HAMP guidelines.

5.      As a HAMP servicer, Defendant was required to consider Plaintiff for a HAMP modification and provide Plaintiff with a written confirmation or denial of eligibility, along with the reasons for such denial.  Once approved, Defendant routinely entered into written HAMP Trial Period Plan ("HTPP") Agreements for temporary modifications with other eligible Bank of America borrowers. These HTPP Agreements, which were form contracts, contained express terms stating that to accept their offer to enter into a HTPP, the borrower must simply make his or her first TPP payment by a designated date, and that if the borrow made all HTPP payments on time and continued to meet all eligibility requirements of the modification program, the borrower's mortgage would be permanently modified.

6.      HAMP and its associated directives also set prohibitions against certain conduct including instituting or continuing foreclosure proceedings while a borrower is being evaluated for a loan modification, and restrictions on the way a servicer may report the borrower to credit reporting agencies.

7.      Though Bank of America accepted $25 billion in TARP funds and entered into a

contract obligating itself to comply with the HAMP directives and to extend loan modifications for the benefit of distressed homeowners, Bank of America has systematically failed to comply with the terms of the HAMP directives and has regularly and repeatedly violated several of its prohibitions.

8.      Under HAMP, the federal government incentivizes participating servicers to make adjustments to existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1,000.00 for each HAMP modification. However, this incentive is countered by a number of financial factors that make it more profitable for a mortgage servicer such as BOA to avoid modification and to continue to keep a mortgage in a state of default or distress and to push loans toward foreclosure. This is especially true in cases where the mortgage is owned by a third-party investor and is merely serviced by BOA because BOA does not carry a significant risk of loss in the event of foreclosure. On information and belief, BOA does not own a significant majority of the loans on which it functions as servicer and does not own the mortgage that is the subject of this suit.

9.      Economic factors that discourage BOA from meeting its obligations under HAMP by facilitating loan modifications include the following:

- BOA may be required to repurchase loans from the investor in order to permanently modify the loan. This presents a substantial cost and loss of revenue that can be avoided by keeping the loan in a state of temporary modification or lingering default.

- The monthly service fee that BOA, as the servicer collects as to each loan it services in a pool of loans, is calculated as a fixed percentage of the unpaid principal balance

of the loans in the pool. Consequently, modifying a loan to reduce the principal

balance results in a lower monthly fee to the servicer.

- Fees that BOA charges borrowers that are in default constitute a significant source of

  revenue to it. Aside from income BOA directly receives, late fees and "process

  management fees" are often added to the principal loan amount thereby increasing the

  unpaid balance in a pool of loans and increasing the amount of the servicer's monthly

  service fee.

- Entering into a permanent modification will often delay a servicer's ability to recover

  advances it is required to make to investors of the unpaid principal and interest

  payment of a non-performing loan.[1] The servicer's right to recover mortgage is

  owned by a third-party investor and expenses from an investor in a loan modification,

  rather than a foreclosure, is often less clear and less generous.

- Fixed overhead costs involved in successfully performing loan modifications involve

  up-front costs to the servicer for additional staffing, physical infrastructure, and

  expenses such as property valuation, credit reports and financing costs.

10.     Rather than allocating adequate resources and working diligently to reduce the

number of loans in danger of default by establishing permanent modifications, BOA has

serially strung out, delayed, and otherwise hindered the modification processes that it

contractually undertook to facilitate when it accepted billions of dollars from the United

States. BOA's delay and obstruction tactics have taken various forms with the common

---

[1] *See* Thompson, Diane E., *Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior*, National Consumer Law Center (October 2009).

result that homeowners with loans serviced by BOA, who are eligible for permanent loan modifications, and who have met the requirements for participation in HAMP, have not received permanent loan modifications to which they are entitled.

11.     In addition to its obligations based on its contract with the Treasury Department, as a participating servicer in HAMP, BOA entered into a standardized contract with Plaintiff for a Temporary Trial Modification of his existing note and mortgage. Such modification agreement promises that if the borrower complies with the terms of the temporary modification agreement by making timely payments and continues to meet all of the eligibility requirements, then the borrower will receive a permanent modification on the same terms. The contract, known as a "HAMP Trial Period Plan" ("HAMP TPP") Agreement, is for a finite time period, three months.

12.     Instead of offering Plaintiff with a HAMP TPP or a letter denying Plaintiff's eligibility as required, Defendant offered Plaintiff a more expensive Fannie Mae Trial Period Payment Agreement ("FM TPP")

13.     Nevertheless Plaintiff accepted the FM TPP Agreement and expected to receive either a final modification or a denial of eligibility before the end of the trial period. Neither was forthcoming. Despite Plaintiff's efforts, BOA has ignored its contractual obligation to modify his loans permanently under the FM TPP or to consider him for HAMP under the SPA Agreement.

14.     Because BOA is not meeting its contractual obligations or its obligations under HAMP directives and guidelines, Plaintiff is wrongfully being deprived of an opportunity to cure his delinquencies, pay his mortgage loan and save his home. By failing to live up to its obligations under the terms of the agreement it entered into with the Department of

the Treasury, and the terms of the contract it formed with Plaintiff, BOA has left Plaintiff in a state of limbo – and worse off than he was before he sought a modification from BOA.

15.     Defendants' actions violate their contractual obligations, thwart the purpose of HAMP, and are unfair and deceptive under Illinois law.

16.     Plaintiff has complied with his contractual obligations under his FM TPP Agreement by submitting all required documentation, answering all questions truthfully, keeping his representations true and accurate, and by making his trial period payments on time. Despite Plaintiff's full performance, Defendant has ignored its obligations by refusing to extend Plaintiff an offer for permanent modification as required under the program guidelines and its contract.

17.     Defendant's failure to extend an offer for permanent modification is no accident. To the contrary, Defendant has knowingly established a system designed to wrongfully deprive its eligible HAMP borrowers of an opportunity to modify their mortgages, pay their loans, and save their houses from foreclosure. Defendant's actions, which serve only its interest in extracting as much money as possible from borrowers it deems are at risk of default, thwart the very purpose of HAMP, constitute express and implied breaches of its various contracts, and amount to immoral and unfair business practices under the Illinois Consumer Fraud and Deceptive Business Practices Act, among others.

Jurisdiction of this Court arises under 28 U.S.C. § 1331, as a claim arises under the federal law, Fair Debt Collection Practices Act, 15 U.S.C. § 1601-1692(o).

## JURISDICTION AND VENUE

18.     This Court has jurisdiction pursuant to § 1692k(d) of the FDCPA, and 28

U.S.C. § 1331.

19.     This Court also has Diversity Jurisdiction under 28 U.S.C. § 1332(a) because the

parties are citizens of different states and the amount in controversy exceeds the sum or

value of $75,000.

20.     This Court has supplemental subject-matter jurisdiction over the pendent state law

claims under 28 U.S.C. § 1367.

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as unlawful

practices are alleged to have been committed in this District, Defendant regularly

conducts business in this District, and the Plaintiff resides in this District.

## **PARTIES**

22.     Plaintiff Jon Heyer is a natural person and a citizen of the state of Illinois.

Plaintiff resides on Lakeview Way in Mokena, Illinois and his home mortgage is the loan

at issue in this suit. At all times relevant, Plaintiff was, on information and belief, pre-

verified, qualified and eligible to participate in the HAMP program under all applicable

directives and guidelines.

23.     Defendant Bank of America, N.A. is a Delaware corporation acting and operating

as a mortgage lender and debt collector, and maintaining its principal place of business at

101 North Tryon Street, Charlotte, North Carolina.  At all times relevant to this

Complaint, Bank of America was doing business in Illinois as an unregistered foreign

corporation.

24.     Defendant BAC Home Loans Servicing, LP is a subsidiary of Bank of America,

N.A., located at 4500 Park Granada, Calabasas, California 91302.

25.     At all times herein mentioned, Defendants, Bank of America, N.A. and BAC
Home Loans Servicing, LP, both individually and collectively, are and were agents
and/or joint venturers of each other, and in doing the acts alleged herein were acting
within the course and scope of such agency.

26.     Each Defendant had actual and/or constructive knowledge of the acts of the other
Defendant as described herein, and ratified, approved, joined in, acquiesced in, and/or
authorized the acts of the other, and/or retained the benefits of said acts.

## FACTUAL BACKGROUND

### *Congressional Response to National Foreclosure Crisis*

27.     Over the last several years, the United States has witnessed a foreclosure crisis. A
congressional oversight panel has recently noted that one in eight U.S. mortgages is
currently in foreclosure or default.[2]  Increased foreclosures have a detrimental effect on
borrowers who are at serious risk of losing their homes. Foreclosures also have a negative
impact on the surrounding neighborhoods that suffer decreased property values, and
municipalities lose tax revenue as a result of foreclosures.

28.     On October 3, 2008, Congress passed the Emergency Economic Stabilization Act
of 2008 and, on February 17, 2009, Congress amended the statute by passing the
American Recovery and Reinvestment Act of 2009 (collectively the "Act"). 12 U.S.C. §
5201 *et. seq.* (2009). The purpose of the Act is to grant the Secretary of the Treasury the
authority to restore liquidity and stability to the financial system and ensure that such

---

[2] http://cop.senate.gov/press/releases/release-100909-foreclosure.cfm (last visited June
23, 2010).

authority is used in a manner that "protects home values" and "preserves homeownership." 12 U.S.C. § 5201.

29.     The Act grants the Secretary of the Treasury the authority to establish TARP. 12 U.S.C. § 5211. Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions. *Id.* In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3).

30.     The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and that uses the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures." 12 U.S.C. § 5219. The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." *Id.* The Act further imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures. 12 U.S.C § 5220.

31.     On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the HAMP program. Under HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1,000.00 for each HAMP modification.

*Servicer Participation in the HAMP program*

32.    The industry entities that perform the actual interface with borrowers – including

such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure –

are known as "servicers." Servicers typically act as the agents of the entities that hold

mortgage loans. Defendant is a servicer and its actions described herein were made as an

agent for the entities that hold mortgage loans.

33.    To participate in HAMP, a servicer must execute a Servicer Participation

Agreement ("SPA") with the federal government.

34.    The SPA executed by incorporates all "guidelines," "procedures," and

"supplemental documentation, instructions, bulletins, frequently asked questions, letters,

directives, or other communications" issued by the Treasury, Fannie Mae or Freddie

Mac, in connection with the duties of Participating Servicers.

35.    The SPA mandates that a Participating Servicer "shall perform" the activities

described in the Program Documentation "for all mortgage loans it services."

36.    The Program Documentation requires Participating Servicers to evaluate *all loans*

that are delinquent 60 days or greater for HAMP modifications. In addition, if a borrower

contacts a Participating Servicer regarding a HAMP modification, the Participating

Servicer must collect income and hardship information to determine if HAMP is

appropriate for the borrower.

### *HAMP TPP Agreements*

37.    A HAMP Modification consists of two stages. First, a Participating Servicer is

required to gather a borrower's financial and other relevant information and, if the

borrower qualifies, offer the borrower a HAMP TPP Agreement. Defendant's form

HAMP TPP Agreements require borrowers to make certain representations, provide

relevant information, and make trial period payments at a revised rate designed to keep the borrower in his or her home. (*See* Exhibit A.)

38.     A mortgage is eligible for HAMP if threshold criteria enumerated in the Program Documentation are met. Aside from criteria that require the loan to be a first lien mortgage originated before 2009, that the property be occupied, and that it be the borrower's principal residence, the most salient conditions are that the loan is delinquent or default is reasonably foreseeable; that the borrower documents a financial hardship (as defined in the Program Documentation); and that the "borrower has a monthly mortgage payment ratio of greater than 31 percent" of the borrower's monthly income.

39.     Plaintiff made an application that included personal financial information, tax information, and a statement attesting to his hardship.

40.     Once the participating servicer has determined a borrower meets HAMP's threshold requirements, based on both information already in its possession and information submitted by the applicant homeowner, the servicer must then determine if the borrower is eligible to receive a HAMP modification, the goal of which is to modify the terms of the loan such that for the first five years, the monthly mortgage payment is equal to 31 percent of the borrower's income.

41.     The servicer does this by applying the steps enumerated in the Program Documentation to the loan, in the stated order of succession until the borrower's monthly The eligibility criteria for HAMP, as well as the formula used to calculate monthly mortgage payments under the modification, are explained in detail in SD 09-01, attached hereto as Exhibit C. Generally speaking, the goal of a HAMP modification is for owner-

occupants to receive a modification of a first-lien loan by which the monthly mortgage payment is reduced to 31% of their monthly income for the next five years.

42.     Mortgage payment ratio is reduced to 31 percent of the borrower's monthly income. This process is known as the "waterfall." These steps include capitalizing accrued interest and escrow advances, reducing the interest rate, extending the term and re-amortizing the loan (if necessary), and providing a principal forbearance (if necessary). *See* SD 09-01 (Exhibit C) at 8-10. BOA does not have discretion as to how this formula is applied – HAMP rules require servicers to take these enumerated steps in the prescribed order until the target monthly mortgage payment equaling 31% of monthly income is reached.

43.     If application of the steps in the Program Documentation yields terms that produce the target 31% monthly mortgage payment, the servicer must offer the borrower a TPP Agreement if the modification provides a net present benefit to the mortgage holder. This determination is known as the "Net Present Value" or ("NPV") test and is to be performed prior to the tender of a TPP Agreement.

44.     The HAMP TPP Agreement describes a three or four month trial period in which the homeowner makes mortgage payments based on the modification formula stated in the Program Documentation. BOA uses a standard form agreement to offer HAMP TPP Agreements to eligible homeowners. One such example of a form HAMP TPP Agreement is attached hereto as Exhibit A. This agreement describes the homeowner's duties and obligations under the plan and promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements.

45.     Defendant's HAMP TPP Agreements provide that Defendant will extend offers for permanent modification to those homeowners who execute the HAMP TPP Agreement and fulfill the documentation and payment requirements. (*Id.*) If a homeowner executes the HAMP TPP Agreement[3], complies with all documentation and representation requirements, and makes all of the TPP monthly payments on time, the second stage of the HAMP process is triggered in which Bank of America is required to offer the home owner a permanent loan modification. This lawsuit challenges the fact that, despite full performance by Plaintiff, Bank of America failed, as it routinely does with other borrowers, to extend an offer to Plaintiff for a HAMP TPP and never provided Plaintiff with a written letter denying Plaintiff's request for a HAMP modification.

46.     Instead, as further discussed below, Defendant entered into a Trial Period Plan Agreement with Plaintiff for a "Fannie Mae Modification" (hereinafter referred to as "FM TPP."

47.     However, Plaintiff believed that he was accepting a HAMP modification, based on Defendant's misrepresentations; omissions; and admissions contained in court orders, as further detailed below.

48.     Like Defendant's HAMP TPP, Defendant's FM TPP provides that Defendant will extend offers for permanent modification to Plaintiff as long as Plaintiff met the payments requirements and remained eligible TPP Agreement and fulfill the documentation and payment requirements.  Plaintiff complied with all of the requests made by Defendant demanded for acceptance of the FM TPP.   Thus, Bank of America is

---

[3] On October 8, 2009, the HAMP Supplemental Directive 09-07 adopted the new form of the TPP Agreement that no longer required a borrower's signature.

required to offer the Plaintiff a permanent loan modification. This lawsuit challenges the fact that, despite full performance by Plaintiff, Bank of America failed, as it routinely does with other borrowers, to extend an offer to Plaintiff for a HAMP TPP; never provided Plaintiff with a written letter denying Plaintiff's request for a HAMP modification; and failed to extend a permanent offer of modification under the FM TPP, despite Plaintiff's full performance and acceptance.

49.     By failing to live up to its end of the FM TPP Agreement and offer a permanent modification as required, Bank of America has deprived Plaintiff of his ability to save his home, and has instead left him in a state of limbo, unsure of whether Bank of America is setting him up for foreclosure proceedings. Bank of America's conduct has also prevented Plaintiff from pursuing other avenues of resolution, including using the money put toward FM TPP Agreement trial payments to fund bankruptcy plans, perform an efficient breach, relocation costs, short sales, or other means of curing Plaintiff's default or preventing imminent default.

## FACTS RELATING TO PLAINTIFF HEYER

50.     On or about March 28, 2008, Plaintiff obtained a mortgage loan for his personal residence located in Mokena, Illinois from Countrywide Bank FSB.

51.     On or about July 2008, Bank of America acquired Countrywide Bank FSB, which was under investigation for mortgage fraud.

52.     With the economic downturn, Plaintiff began experiencing a financial hardship and on June 19, 2009, Plaintiff contacted Defendant's loss mitigation department and made a written request for a loan modification under the HAMP plan. Throughout June and July 2009, Plaintiff also sent Bank of America all of the financial disclosures

necessary to determine if he qualified for the HAMP plan. Plaintiff was not in default under his mortgage agreement at that time.

53.    Plaintiff continued to supplement his financial disclosures as and when requested by Bank of America in furtherance of his request for a HAMP modification

54.    Plaintiff ultimately fell behind in his mortgage payments in approximately November 2009, yet made intermittent partial payments during 2010.

55.    On October 13, 2010, BAC Home Loans Servicing, LP FKA Countrywide Home Loans Servicing LP filed a complaint for foreclosure against Plaintiff in Will County, Illinois under case number 2010 CH 006389 and seeking a deficiency judgment against Plaintiff (hereinafter referred to as the "Foreclosure State Case").

56.    On November 10, 2010 an assignment of mortgage in favor of BAC HOME LOANS SERVICING LP COUNTRYWIDE HOME LOANS SERVICING LP was recorded on the subject property with the Will County Recorder of Deeds. *See* Record of Assignment, attached as <u>Exhibit D</u>.

57.    In December 2010, Defendant sent Plaintiff two letters offering Plaintiff the ability to reinstate his mortgage and become current by making specified payments. *See* Reinstatement Letters, attached as <u>Group Exhibit E</u>.

58.    On December 28, 2010, Plaintiff attempted to accept Defendant's reinstatement offer by making the first specified payment in the amount of $1,963.37. *See* December 28, 2010 Record of Payment, attached as <u>Exhibit F</u>.

59.    However, Defendant refused to accept the payment and returned the funds to Plaintiff.  Moreover, Defendant's customer service representative told Plaintiff that Defendant had "no record" of the payment in Defendant's system.

60. On January 1, 2011, Defendant Heyer appeared in the Circuit Court of Will County and once again requested a HAMP modification and was ordered to submit yet another application to counsel for BAC in the Foreclosure State Case. *See* January 18, 2011 Order, attached as <u>Exhibit G</u>.

61. Plaintiff once again complied and provided Defendant with each and every document requested by Defendant, yet Plaintiff did not receive any letter advising of a grant or denial of his HAMP request.

62. On March 15, 2011, Defendant and Plaintiff attended a Residential Foreclosure Mediation in the Foreclosure State Case.

63. A Defendant representative with binding authority attended the mediation held on March 15, 2011 and upon reviewing Plaintiff's submitted application and documents, offered Plaintiff Heyer a HAMP modification that would make his payments approximately $1,260.00 per month.

64. On May 9, 2011, counsel for BAC in the Foreclosure State Case admitted that during the mediation, the parties agreed to a temporary (not final) HAMP loan modification. *See* May 9, 2011 Order, attached as <u>Exhibit H</u>.

65. Plaintiff once again waited for Defendant to send him the temporary HAMP modification (HAMP TPP Agreement) and made numerous telephone calls to Defendant in an attempt to secure the same.

66. Defendant's representatives repeatedly told Plaintiff that his request was still under review or was in underwriting.

67. On November 7, 2011, the plaintiff in the Foreclosure State Case brought a Motion to Substitute Plaintiff Due to Merger, explaining that BAC HOME LOANS

SERVICING, LP FKA COUNTRYWIDE HOME LOAN SERVICING LP filed the state

complaint, but had subsequently merged with BANK OF AMERICA, N.A. S/B/M BAC

HOME LOANS SERVICING, LP FKA COUNTRYWIDE HOME LOANS

SERVICING LP.

68.     On November 26, 2011 Defendant told Plaintiff that his modification had gone to

an underwriter on October 12, 2011 and that it can take an additional six (6) months to

determine whether or not he would be approved for a modification.  However, the

representative stated that Defendant hoped to have an answer by December 15, 2011

because the home would be sold at auction on February 22, 2012.

69.     On February 22, 2012, while Plaintiff was still awaiting a denial or approval of

his modification request, Plaintiff's home was sold at auction for the amount of

$257,926.38 to Bank of America, N.A. S/B/M BAC HOME LOANS SERVICING, LP

FKA COUNTRYWIDE HOME LOANS SERVICING LP.

70.     When the home was sold at auction on February 22, 2012, Plaintiff still had not

received any approval or denial from Defendant of his modification request.

71.     Between November 11, 2011 and March 6, 2012, Plaintiff placed numerous calls

to Defendant requesting an update on the status of his request for modification.  Each of

Plaintiff's requests was met with the same response by Defendant's representatives: we

have no new updates from the underwriter and will escalate your file.

72.     Finally, on about March 15 2012, nearly one year to the date following the

mediation in which Defendant agreed to offer Plaintiff a HAMP TPP Agreement of

modification, Plaintiff received a letter approving him to "enter into a trial period plan for

a Fannie Mae loan modification." *See* March 15, 2012 Trial Period Plan Agreement

(hereinafter referred to as the "FM TPP"), attached as <u>Exhibit I</u>.

73.     The FM TPP states, in pertinent part: "To accept this offer, you must make your

first Trial Period Plan payment by April 1, 2012." And directs Plaintiff to:

> **Send your month monthly Trial Period Plan payments- instead**
>
> **of your normal monthly mortgage payments- as follows:**

| Trial Period Plan |
| --- |
| 1st Payment: $1,794.59 by 04/01/2012 |
| 2nd payment: $1,794.59 by 05/01/2012 |
| 3rd payment: $1,794.59 by 06/01/2012 |

> […]
>
> After you make all trial period payments on time, and if you
>
> continue to meet all of the eligibility requirements of your
>
> modification program, your mortgage will be permanently
>
> modified.

*See* <u>Exhibit I</u>, emphasis in original.

74.     Plaintiff believed that he was being offered a HAMP TPP because Defendant's

representatives routinely and repeatedly told him that he was under consideration for a

HAMP TPP Agreement and he had court orders prepared by Defendant's attorneys

stating that Plaintiff was going to be offered a HAMP TPP Agreement. See Orders,

attached as <u>Exhibits G & H</u>.

75.     Plaintiff made each and every payment, on-time, as directed by Defendant in the

FM TPP, and kept thorough records of the same.

76.     However, Defendant claimed that it did not receive such payments and did not post the payments to Plaintiff's mortgage.

77.     On April 23, 2012, Defendant's representative, Angela Weldon, admitted that Defendant had received the payments, but they had been "miscoded."

78.     On information and belief, Plaintiff never received credit for any of the payments he made following his initial default, which has resulted in inaccurate credit reporting against Plaintiff and resulted in a greater judgment in favor of Defendant than Defendant was actually entitled to in the State Foreclosure Case.

79.     On May 29, 2012, Weldon admitted that Defendant had received the final Trial Period Plan payment due June 1, 2012 and that Defendant would need an additional 30-60 days to provide Plaintiff with his permanent modification.  Weldon further told Plaintiff to continue to make the Trial Period Plan payments until he received the permanent modification. Weldon never told Plaintiff that the modification was not a HAMP modification.

80.     Nevertheless, on June 1, 2012, Defendant brought a Motion to Approve Sale, which incorporated by reference, the Sheriff's Report for Sale and Distribution which claimed a "Deficiency pursuant to Plaintiff's calculations" $4,583.08."  *See* attached as Group Exhibit J.

81.     On June 8, 2012, Defendant obtained an order granting approval of the February 22, 2012 sheriff sale and ordering the Plaintiff to be evicted from his home on July 8, 2012.  *See* June 8, 2012 Order, attached as Exhibit K.

82.     From June 12, 2012 until July 26, 2012, Plaintiff called Defendant several times attempting to ascertain why he was being evicted from his home when he had entered into and complied with all of the terms of the FM TPP Agreement.

83.     On July 26, 2012, Plaintiff was contacted by Greg Williams, one of Defendant's representatives.

84.     Mr. Williams told Plaintiff that his home had been purchased "by another bank" but that Mr. Willams was in the process of rescinding the purchase and that all of the payments made under the FM TPP would be applied to the permanent mortgage and to continue making payments under the FM TPP.

85.     On August 15, 2012, Mr. Williams informed Plaintiff that the rescission was "complete" and that Williams was going to "personally push the permanent modification through."

86.     On August 21, 2012, the February 22, 2012 sale was actually vacated and the order states that it is vacated "due to loan modification review on the subject case." *See* August 21, 2012 Order, attached as <u>Exhibit L</u>.

87.     On August 21, 2012, the State Foreclosure Case was also dismissed without prejudice. *See* Docket, attached as <u>Exhibit M</u>.

88.     On August 28, 2012, Defendant returned Plaintiff's August 2012 FM TPP payment.

89.     From August 28, 2012 until November 27, 2012, Plaintiff made numerous calls to Defendant in an attempt to gain information related to his permanent modification.

90.     On November 27, 2012, Plaintiff spoke to Defendant representatives Wanda
Polite and Robin Springer, both of whom told Plaintiff that they were going to investigate
and update the status of the Plaintiff's permanent modification.

91.     On December 6, 2012, Wanda Polite told Plaintiff that Defendant required only
one additional step before the permanent modification would finally be approved: a title
check.

92.     On January 4, 2013, Defendant informed Plaintiff that the permanent modification
could not be completed because a title search revealed a Memorandum of Judgment from
April 7, 2005 (three years before Plaintiff originally closed on the subject mortgage)
against individuals named Robin Naser and John C. Heyer, not Plaintiff Jon K. Heyer.

93.     Also on January 4, 2013, Defendant representative named Lynn told Plaintiff that
Plaintiff's loan was no longer through Fannie Mae and had now "bounced back to Bank
of America."

94.     On January 7, 2013, Plaintiff hired attorney John C. Clavio to review Plaintiff's
Title Policy from the March 28, 2008 mortgage.

95.     That Attorney Clavio determined that the April 7, 2005 Memorandum of
Judgment was not on title at the time of the March 28, 2008 mortgage and that the
Memorandum of Judgment was not in the Plaintiff's name.  *See* Memorandum of
Judgment, attached as Exhibit N.

96.     From January 7, 2013 until March 29, 2013, Plaintiff made numerous calls and
facsimiles in an attempt to provide Defendant with documentation proving that the
Memorandum of Judgment was not against Plaintiff.

97.     Eventually, Attorney Clavio was able to satisfy Defendant and its attorney, Joseph

Magallaness of Pierce & Associates, that the Memorandum of Judgment was completely

unrelated to Plaintiff.

98.     From March 23, 2012 until December 2012, Plaintiff made timely FM TPP

Agreements in the amount of $1,794.59 until a Defendant began to return his payments

and a Defendant representative told him not to bother sending any other payments, as

they would be returned to Plaintiff by Defendant.

99.     On May 15, 2013, Defendant told Attorney Clavio that Defendant had closed the

modification file and that Plaintiff would need to "start over from the beginning."

100.    Since March 2011, Plaintiff has attempted to get Defendant to honor HAMP; and

its end of the bargain and offer him a permanent modification as promised under the FM

TPP. Discussions with various Defendant representatives revealed that Defendant had

improperly re-evaluated Plaintiff's eligibility, had erroneously determined that there was

a lien on title, and had wrongfully concluded that he did not qualify for an offer for

permanent modification. Despite repeatedly explaining to various Defendant's

representatives that the bank had improperly subjected to him to reevaluation and, in the

process, had performed various miscalculations, Defendant refused, and continues to

refuse, to offer him a permanent modification or send him a modification agreement for

his signature as required under the terms of HAMP and the FM TPP Agreement. Rather,

Defendant has asked Plaintiff to re-submit documentation already in Defendant's

possession.

101.    As of the filing of this Complaint, Defendant has not provided Plaintiff with a

permanent modification agreement for his signature or otherwise extended him an offer

for permanent modification or provided Plaintiff with a written denial or acceptance of HAMP eligibility.

## COUNT I- Breach of Contract

102.    Plaintiff repeats and re-alleges the allegations in paragraphs 1-101 above as if set forth herein in full.

103.    As described above, the FM TPP Agreement offered by Defendant and accepted by Plaintiff constitutes a valid contract. (*See* <u>Exhibit I</u>)

104.    Bank of America's sending of the FM TPP Agreement to Plaintiff was an offer, and Plaintiff accepted this offer by making his first FM TPP payment before April 1, 2012.

*Contract Formation: Consideration*

105.    The FM TPP Agreement is supported by consideration in the form of an exchange of mutual promises. In addition to making temporary trial payments on time, Plaintiff promised to remain eligible. In exchange, Defendant promised to send Plaintiff an agreement for permanent modification upon his completion of the FM TPP Agreement.

106.    In addition or in the alternative, the FM TPP Agreement is supported by further consideration in the form of each party foregoing legal obligations and rights. Plaintiff forewent alternative avenues he could have pursued including, by way of example, bankruptcy or listing the property. Defendant agreed to forego foreclosure proceedings and late fees. Both sides benefited from the exchange in that Plaintiff was presented with an opportunity to save his home at a reduced payment and receive incentive payments from the government, while Defendant enjoyed the ability to keep a paying customer,

receive incentive payments for performing the modification from the government, and avoid the costs and risks associated with foreclosure.

107.    In the alternative, and explained in Count II and as incorporated fully herein, Plaintiff's justifiable reliance serves as a substitute for any lack of consideration and should act as an estoppel against Defendant to raise lack of consideration as a defense.

*Plaintiff's Performance*

108.    Plaintiff made his temporary trial payments and otherwise complied with the FM TPP Agreements by keeping all information and representations true and accurate in all material respects, and by taking all such other steps necessary under his FM TPP Agreement.

*Express Contract Terms*

109.    Plaintiff's FM TPP Agreement provided that "To accept this offer, you must make your first Trial Period Plan payment by 04/01/2012."

110.    Plaintiff's FM TPP Agreement further provided that "After you make all trial period payments on time, and if you continue to meet the eligibility requirements of your modification program, your mortgage will be permanently modified." *See* Exhibit I.

*Defendant's Breach of Express Terms*

111.    Rather than extending an offer for permanent modification to Plaintiff, Defendant, improperly and without justification, ultimately decided to treat the FM TPP Agreement as if it was null and void. These actions by Defendant constituted a breach of contract, causing Plaintiff to suffer damages in losing his permanent modification, a negative

impact on his credit score, late fees and other fees assessed by Defendant as a result of a denial of permanent modification, lost opportunities to pursue other avenues for saving his home, and the lost ability to collect government incentive payments for HAMP compliance.

*Implied Contract Terms*

112.    In addition, Defendant breached an implied term that required Defendant to extend the offer for permanent modification within a reasonable period of time following Plaintiff's performance under the FM TPP Agreement.

113.    The TPP Agreement, like all contracts entered into in Illinois, contained an implied duty of good faith and fair dealing. Insofar as the FM TPP Agreement placed discretion and broad authority in Defendant to determine HAMP and/or FM TPP eligibility and to administer the HAMP modification program, Defendant had a duty to perform consistent with its duty of good faith and fair dealing.

*Defendant's Breach of Implied Terms*

114.    The Defendant breached these implied duties by:

    a.  failing to perform loan servicing functions consistent with its responsibilities to Plaintiff using acceptable professional standards of care;

    b.  failing to properly supervise its agents and employees including, without limitation, its loss mitigation and collection personnel and its foreclosure attorneys or otherwise use individuals with suitable training, education, experience and skills to perform loan servicing functions;

    c.  routinely demanding information already in its files and otherwise filing to implement an appropriate and functioning document management system;

    d.   providing false justifications for refusing to extend offers for permanent modification;

    e.   systematically making inaccurate calculations and determinations of Plaintiff's eligibility for HAMP;

    f.   failing to provide Plaintiff with a determination of his eligibility under HAMP and repeatedly misrepresenting that his was under HAMP consideration, when in fact the modification offered was a Fannie Mae, not HAMP, modification;

    g.   unreasonably delaying the extension of offers for permanent modifications to Plaintiff who performed fully and faithfully under his FM TPP Agreement as described, above; and

    h.   acting in a manner that otherwise constitutes an abuse of discretion or authority under the FM TPP Agreement or taking such other steps to frustrate Plaintiff's ability to receive the benefit of his bargain under the FM TPP Agreement or under HAMP and its guidelines and directives.

*Causation and Damages*

115.   As an actual and proximate result of Defendant's breaches of these express and implied contractual terms described herein, Plaintiff has suffered harm and is threatened with additional harm. Plaintiff has been damaged insofar as he has been improperly denied an offer for a permanent loan modification, which he stands ready, willing and able to accept.

116.   Plaintiff has further been damaged in the form of lost time and opportunity costs. By entering into the FM TPP Agreement and making his payments both during and after

the trial period, Plaintiff spent monies on a plan that could have gone towards other

potential remedies that he might otherwise have pursued to save his home. Plaintiff also

lost the opportunity to restructure his debt under the bankruptcy code, sell his home on

favorable terms, pursue refinancing with other lenders, take other steps to address his

financial hardship and threatened loss of his home, perform efficient breaches to cut his

losses, or receive program incentive payments. In addition, Plaintiff suffered negative

impact on his credit score and paid late fees and other fees assessed as a result of his

removal from the HAMP.

117. An award of damages, may be inadequate remedy to compensate Plaintiff for the

harm caused to him by Defendant's breach of contract. As such, Plaintiff additionally

seeks injunctive relief in the form of an order compelling Defendant to specifically

perform under its FM TPP Agreements and extend Plaintiff the offer for permanent

modification he had been promised. Moreover, Defendant should be compelled to

consider Plaintiff under HAMP and provide a written letter confirming or denying his

eligibility.

118. An order of specific performance may be warranted in this case because damages

may not make the Plaintiff whole and the risk of under-compensation is high, the FM

TPP Agreements are specific enough and are capable of being performed by Defendant

with minimal judicial supervision, according to the terms of the applicable HAMP

Directives.

119. In the alternative, if the Court determines that an award of damages will be a

sufficient remedy, Plaintiff seeks damages for Defendant's breach of contact to the

maximum extent allowed by law, and, in any case, interest, costs, and attorneys' fees in an amount to be determined at trial.

## COUNT II-Promissory Estoppel, *In the Alternative* to Count I

120.    Plaintiff repeats and re-alleges the allegations of paragraphs 1-101 above as if set forth herein in full.

121.    Defendant, by way of its FM TPP Agreement, unambiguously promised to Plaintiff that if he made his FM TPP payments on time and otherwise fully complied with the terms of his FM TPP Agreements, he would receive an offer for permanent modification.

122.    Defendant's promise was intended to induce Plaintiff to rely on it and make monthly FM TPP payments and otherwise perform.

123.    Plaintiff indeed relied on Defendant's promise by submitting FM TPP payments and all necessary documentation and otherwise fully performing under his FM TPP Agreement.

124.    Given the language in the FM TPP Agreement, Plaintiff's reliance was reasonable.

125.    Plaintiff's reliance was to his detriment.  Plaintiff has yet to receive a permanent modification agreement or any other offer for permanent modification, has lost the opportunity to fund other strategies to deal with his default and avoid foreclosure or perform an efficient breach to cut his losses, has experienced adverse effects on his credit score, incurred damages while defending against unjustified foreclosure proceedings, lost government incentive payments that are provided the first 5 years of successful

completion of the program, and paid late fees and other fees assessed as a result of his removal from the Program.

126.    An award of damages, however, may ultimately be an inadequate remedy to compensate Plaintiff for the harm caused to him by Defendant's breach of promises regarding extending loan modifications. As such, Plaintiff seeks injunctive relief in the form of an order compelling Defendant to honor its promise to Plaintiff and extend Plaintiff an offer for permanent modification on the terms consistent with its FM TPP or with the applicable HAMP Directives.

127.    As the HAMP was specifically enacted to help struggling homeowners to stay in their homes, justice requires that Defendant be ordered to deliver on its promises to Plaintiff. Minimal, if any, judicial supervision will be required with regard to the specific performance of the promises since they can be performed under the terms and conditions of the applicable HAMP Directives.

128.    *In the alternative*, if the Court determines that an award of damages is a sufficient remedy to make the Plaintiff whole or that the risk of under-compensation is high, Plaintiff seeks damages for Defendant's breach of promises to extend a permanent modification to Plaintiff to the maximum extent allowed by law, as well as all interest, costs, and attorneys' fees in the amount to be determined at trial.

**Count III- Fraudulent Misrepresentation**

129.    Plaintiff repeats and re-alleges the allegations of paragraphs 1-101 above as if set forth herein in full.

*Misrepresentation*

130.    In its FM TPP Agreement that it sent to Plaintiff, Defendant represented that "After you make all trial period payments on time, and if you continue to meet all of the eligibility requirements of your modification program, your mortgage will be permanently modified." (Exhibit I.)

131.    Defendant knew these representations were false at the time it sent the respective FM TPP Agreements to Plaintiff. Defendant had absolutely no intention to modify Plaintiffs' mortgage. Instead, it devised and implemented a scheme whereby it stood to extract as much money as possible from the defaulting homeowner for as long as possible while receiving hefty fees for servicing his loans without ever extending the promised loan modifications.

132.    These representations were also material insofar as Plaintiff would not have entered into the FM TPP Agreement or otherwise wasted time and recourses attempting to comply with its terms had he known Defendant had no intention to offer him a permanent modification.

133.    Moreover, Defendant repeatedly told Plaintiff that he was under a HAMP modification consideration, and never told him that he was not being considered for a HAMP.

134.    Defendant made these false representations to induce Plaintiff to enter into the FM TPP Agreement and make the temporary payments.

135.    Plaintiff reasonably relied on Defendant's false representations by entering into and complying with the terms of his FM TPP Agreement.

136.    Plaintiff's reliance on these false statements actually and proximately caused him to suffer damages in that he never received a permanent modification of his mortgage

loan, he made FM TPP payments using money that could have been used to pursue other avenues of relief, lost time, paid late fees and other fees assessed by Defendant after dropping Plaintiff from the Program, suffered adverse effect on his credit score, lost incentive payments for complying with the program, and lost the opportunity to pursue other avenues for saving his home and credit.

137.    Plaintiff seeks actual damages caused by Defendant's false misrepresentations, including attorney fees for attorneys hired in an effort to comply with Defendant's demands before it would provide the permanent modification, punitive damages, interests, costs, and attorneys' fees in the amount to be determined at trial, as well as an order compelling Defendant to extend an offer for permanent modification to Plaintiff according to the terms of his FM TPP  or the applicable HAMP directives and to cease proceeding with respect to its FM TPP Agreements as if they are illusory.

**Count IV- Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act") 815 ILCS 505/1 *et seq*.**

138.    Plaintiff repeats and re-alleges the allegations of paragraphs 1-101 above as if set forth herein in full.

*Fraudulent Conduct*

139.    Plaintiff expressly repeats and re-alleges the allegations of paragraphs 50-101 above as if set forth herein in full. Defendant's intentional misrepresentations constitute prohibited fraudulent conduct under the Illinois Consumer Fraud Act.

140.    Plaintiff has suffered actual damages as an actual and proximate result of the Defendant's intentional misrepresentation in that he never received a permanent modification agreement or any other offer for permanent modification, he made FM TPP

payments using money that could have been used to pursue other avenues of relief, suffered damage to his credit, lost time, and lost the opportunity to pursue other avenues for saving his home and credit. Moreover he hired an attorney in an effort to comply with Defendant's baseless claims that a Memorandum of Judgment in the name of another prevented Defendant from complying with the terms of its agreements.

*Unfair, Immoral and Unscrupulous Practices*

141. Defendant's conduct as described throughout this Complaint constitutes unfair, immoral and unscrupulous business practices that harmed not only Plaintiff, but the general public as well. Defendant's immoral and unscrupulous practices, which were implemented so as to extract as much money as possible from borrowers Defendant identified as being at risk for default prior to foreclosure, included but were not limited to:

> a. Defendant knowingly designed and maintained a loan modification system that was riddled with flaws and intentionally staffed with employees who lacked the training, experience, education or skill to accurately perform their obligations.
>
> b. Defendant routinely required Plaintiff to submit and re-submit documents and financial information already in its possession claiming that it would not review a borrower for eligibility until and unless these documents are submitted time and again.
>
> c. Defendant routinely and systematically made incorrect calculations and determinations at improper times during the modification process, falsely claimed that it was permitted to do so under applicable directives and that

it was unable to achieve target income to payment ratios, and routinely

provided customers with other false, pre-textual reasons for refusing to

extend eligible borrowers their offers for permanent modification.

d.   Defendant routinely provided false information regarding its processes and

standards, refused to put statements in writing when asked,

e.   Engaged in other conduct designed to extract money from "at risk"

borrowers as opposed to actually helping such borrowers – who were at all

times HAMP eligible – achieve modified loan terms.

142.   Defendant's conduct described herein actually and proximately caused Plaintiff to

suffer damages as described throughout this Complaint.

143.   Plaintiff seeks actual damages caused by Defendant's deceptive and unfair

conduct in violation of the ICFA, statutory and punitive damages, interest, costs and

attorneys' fees in an amount to be determined at trial, as well as an order enjoining

Defendant from further violations of the ICFA and compelling Defendant to extend a

loan modification to the Plaintiff in accordance with his FM TPP Agreement and/or the

applicable HAMP directives.

**Count V- Violation of the Fair Debt Collection Practices Act ("FDCPA")**

**15 U.S.C. §1692 et seq.**

144.   Plaintiff Jon Heyer ("Plaintiff"), is an individual and resident of Cook County,

Illinois, and is a "consumer" as defined by and within the meaning of the FDCPA at 15

U.S.C. §1692a(3) of the FDCPA.

145.   Defendants, BANK OF AMERICA, N.A., a Delaware Corporation, ("BOA") and

BAC Home Loans Servicing, L.P., a subsidiary of BANK OF AMERICA, N.A., a

Delaware Corporation ("BAC") are both "debt collectors" as defined by and within the meaning of the FDCPA, §1692a, as each regularly collects defaulted consumer debts.

146.     Defendants self-identify as debt collectors in their correspondence with Plaintiff, which state in part "Under the federal Fair Debt Collection Practices Act and certain state laws, Bank of America, N.A. is considered a debt collector." (Exhibit O).

147.     Jurisdiction of this Court arises under 15 U.S.C. § 1692k(d), and 28 U.S.C. §§ 1331, 1337, and 1367.

148.     Venue in this District is proper because Defendants' collection demands were received here, and Defendants transact substantial business here.

149.     On or about March 28, 2008, Plaintiff obtained a mortgage loan for his personal residence located in Mokena, Illinois from Countrywide Bank FSB, thereby incurring an obligation and "debt" as that term is defined by 15 U.S.C. § 1692a(5).

150.     Plaintiff thereafter defaulted on his loan.

151.     Defendants were assigned the loan post-default.

152.     Defendants attempted to collect the alleged debt from Plaintiff via telephone call and letter within the last year prior to the filing of this Complaint.

153.     During the pendency of a telephone call between Plaintiff and Defendants' agent or employee who identified himself as Mr. Williams, Plaintiff was told that his home had been purchased "by another bank" but that Mr. Willams was in the process of rescinding the purchase and that all of the payments made under the FM TPP would be applied to the permanent mortgage and to continue making payments under the FM TPP.

154.     Plaintiff continued making payments toward the alleged debt in reliance.

155. At the time Defendants told Plaintiff that the payments would be applied toward the permanent mortgage, they did not intend to rescind the purchase, or offer Plaintiff a permanent modification.

156. Defendants knew their representations were false at the time it sent the respective FM TPP Agreements to Plaintiff. Defendant had absolutely no intention to modify Plaintiff's mortgage.

157. Defendants representations were intended to cause Plaintiff to continue making payments, and thus to incur fees for as long as possible while Defendants received hefty fees for servicing his loans without ever extending the promised loan modifications.

158. Defendants further misrepresented that Plaintiff's loan modification was denied due to the existence of a judgment previously entered against Plaintiff, when in fact no judgment had been previously entered against Plaintiff.

159. In its attempts to collect the debt allegedly owed by Plaintiff, Defendants violated the FDCPA, 15 U.S.C. § 1692 in one or more of the following ways:

a) Defendants violated 15 U.S.C. §1692d by the foregoing alleged conduct, including by repeatedly informing Plaintiff that a judgment had been entered against him, when no such judgment had ever been entered;

b) Defendants violated 15 U.S.C. §1692e by the foregoing alleged conduct

c) Defendants violated 15 U.S.C. §1692e(2) by falsely telling Plaintiff that a judgment had been entered against him;

d) Defendants violated 15 U.S.C. §1692f by the foregoing alleged conduct, including by inducing Plaintiff to make payments toward the alleged debt under a false pretense that loan modification as imminent, when in fact Defendants sole reason for telling Plaintiff to make loan payments was to force Plaintiff to incur fees to Defendants, and thus cause Plaintiff financial loss; and

e) All other violations discovered during the course of discover and to be proven at trial

160. Plaintiff was damaged by Defendants' actions, both financially and emotionally.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

A.     Award Plaintiff actual and compensatory damages for breach of contract and breach of the implied covenant of good faith and fair dealing in an amount to be determined at trial, or, in the alternative, order Defendant to specifically perform under its FM TPP Agreement or enjoin Defendant from treating its FM TPP Agreements as if they impose no binding obligations on the bank;

B.     Award actual and compensatory damages and order other equitable relief as justice requires, including requiring Defendant to extend Plaintiff an offer for a permanent loan modification on the theory of promissory estoppel;

C.     Award actual, compensatory, and punitive damages for Defendant's fraudulent misrepresentations of material fact, as well as interest, and attorneys' fees and costs in the amount to be determined at trial;

D.     Enter an Order preliminarily and permanently enjoining Defendant's fraudulent, unlawful and unfair business practices as alleged herein, requiring Defendant to consider Plaintiff under HAMP and/or extend Plaintiff a permanent modification of his loan as required by the FM TTP, and award actual, statutory, compensatory and punitive damages for Defendant's violations of the Illinois Consumer Fraud Act, along with interest and attorneys' fees and costs;

E.      Order specific performance of Defendant's contractual obligations together with other relief required by contract, equity and law;

F.      Award Plaintiff the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees;

G.      Enter and Order preliminarily and permanently enjoining Defendant from initiating or proceeding with any foreclosure proceeding without first fairly and accurately determining whether the borrower named in the foreclosure proceeding is eligible for a HAMP or any other modification; and

H.      Actual and Statutory damages pursuant to 15 U.S.C. § 1692k;

I.      Costs and reasonable attorney fees pursuant to 15 U.S.C. § 1692k(a)(3); and

J.      Grant Plaintiff such other and further relief as this Court finds necessary and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Heather L. Blaise

One of Plaintiff's attorneys

Dated: July 2, 2013

Heather L. Blaise

20 N. Clark St., Suite 3100

Chicago, Illinois 60602

312-448-6602

ARDC No. 6298241